IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CARL JAMES COALSON,              )
      Plaintiff,                )
                      )
        v.                        )          CIVIL NO. 3:12cv796 (JAG)
                      )
CAROLYN W. COLVIN,               )
Commissioner of Social Security, )
      Defendant.                )
_____)

## REPORT AND RECOMMENDATION

Carl Coalson ("Plaintiff") is 46 years old and previously worked as a chemical operator, assistant crew leader, realtor, operator/support tech and meat cutter. On January 5, 2007, Plaintiff applied for Social Security Disability ("DIB") under the Social Security Act (the "Act"), claiming disability due to the residual effects of a back injury. Plaintiff's claim was presented to an Administrative Law Judge ("ALJ"), who denied Plaintiff's requests for benefits. On September 7, 2010, the Appeals Council subsequently granted review and remanded for a new hearing. On December 6, 2010, the ALJ held a second hearing. On January 20, 2011, the ALJ found that Plaintiff could perform unskilled, sedentary work with certain limitations. The Appeals Council denied review.

Plaintiff now challenges the ALJ's decision, claiming that the ALJ's determination that Plaintiff's mental condition did not meet the requirements of the applicable listing is not supported by substantial evidence and that Plaintiff retained the physical and mental residual function capacity ("RFC") to perform other work is not supported by substantial evidence. (Pl.'s Mem. in Supp. of Mot. for Summ. J. "Pl.'s Mem." (ECF No. 9) at 16-29.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1]  Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges the ALJ's decision; as such, Plaintiff's education and work history, medical history, medical opinions, reported activities of daily living ("ADLs") and hearing testimony are summarized below.

A.      Plaintiff's Education and Work History.

Plaintiff has a high school education.  (R. at 261.)  He most recently worked as a chemical operator at a chemical plant.  (R. at 285.)  Also, he previously worked as an assistant crew leader at a paper mill, a realtor, an operator/support tech and as a meat cutter.  (R. at 285.)

---

[1]      The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

B.     Plaintiff's Medical History.

1.  Physical Medical History.

On July 14, 2005, Plaintiff saw James W. Ross, M.D. and complained of pain all over. (R. at 382.) Dr. Ross noted a positive Waddell's sign.[2] (R. at 382.)  Additionally, Dr. Ross opined that Plaintiff gave a "dramatic presentation." (R. at 382.)

In March 2006, J. Michael Simpson, M.D. performed a lumbar fusion on Plaintiff at the L4-L5 level. (R. at 441.)  On March 24, 2006, Plaintiff returned and was doing well, reported on and off back and leg spasms, but was otherwise unremarkable. (R. 626.)  On May 30, 2006, Dr. Simpson noted that Plaintiff had made fairly significant progress since the lumbar fusion. (R. at 621.)  Plaintiff's x-ray showed good evidence of fusion healing as well as good position of the hardware. (R. at 621.)  Additionally, Plaintiff stated that he was walking two to three miles each day. (R. at 621.)  On July 11, 2006, Plaintiff stated that he was doing all right and better than he was before the operation. (R. at 618.)  Dr. Simpson noted that Plaintiff remained neurologically intact. (R. at 618.)  Plaintiff's range of motion was moderately limited. (R. at 618.)  Dr. Simpson opined that he anticipated some return to work on Plaintiff's next visit. (R. at 618.)

On September 11, 2006, Plaintiff saw Dr. Simpson and had a number of complaints, including back pain and a vague sense of numbness and tingling bothering Plaintiff sporadically. (R. at 617.)  Dr. Simpson noted that Plaintiff was neurologically intact, that Plaintiff's x-ray showed convincing evidence of a solid fusion and that Plaintiff admitted to exercising on a regular basis. (R. at 617.)  Dr. Simpson released Plaintiff to light duty work on a permanent

---

[2]      Waddel's nonorganic signs are used as a "screening tool for psychological factors in the examination of patients with low back problems." David A. Scalzitti, *Screening Patients for Psychological Factors in Patients with Low Back Problems: Waddell's Nonorganic Signs*, 77 Physical Therapy 306, 311 (1997).  There are eight signs that are grouped in five types: tenderness, simulation, distraction, regional disturbances and overreaction. *Id.* at 307.  A sign observed during an examination is marked as positive. *Id.*  The presence of three or more types "correlate[s] with the results of psychological tests indicating problems." *Id.*

basis.  (R. at 617.)  Two weeks later, Plaintiff completed physical therapy, and his range of motion was within functional limits.  (R. at 457.)

On November 16, 2006, Paul M. Spector, O.D. saw Plaintiff for an independent medical examination in connection with Plaintiff's workers' compensation case.  (R. at 529-35.) Plaintiff's back pain and tingling in his feet were greatly improved compared to before Plaintiff's surgery.  (R. at 531.)  There was a paraspinal muscle spasm at L2-L5 on Plaintiff's left, his deep tendon reflexes were equal bilaterally throughout, and his cranial nerves were intact.  (R. at 531.) Plaintiff's leg raising was impaired by pain to a mild-to-moderate degree.  (R. 532.)

On February 26, 2007, Dr. Simpson saw Plaintiff for his one year post-surgery follow up, and Plaintiff reported that he was generally doing all right, that he was better than pre-operation, but that he had some degree of discomfort.  (R. at 615.)  Dr. Simpson's examination did not reveal evidence of weakness, and Plaintiff's lower extremity motor function was normal.  (R. at 615.)  X-rays showed a solid fusion at the L4-L5 level.  (R. at 615.)  Dr. Simpson issued modified permanent restrictions to lifting no more than twenty-five pounds, no bending and that Plaintiff must be able to alternate standing and sitting as needed.  (R. at 616.)

On March 22, 2007, Dr. Simpson noted that Plaintiff's MRI confirmed typical, post-surgical changes at the L4-L5 level.  (R. at 614.)  Plaintiff had a small, left annular bulge as well as an annular tear, unchanged from before his surgery.  (R. at 614.)  Dr. Simpson's diagnosis was status post-lumbar decompression and fusion with persistent mild-to-moderate back pain.  (R. at 614.)  Dr. Simpson opined that there was not much more that he could offer Plaintiff.  (R. at 614.)  Dr. Simpson encouraged Plaintiff to continue weight reduction and a fairly aggressive exercise regimen.  (R. at 614.)  Dr. Simpson released Plaintiff with the same work restriction as before and advised Plaintiff to follow up as needed.  (R. at 614.)

4

On May 21, 2007, Plaintiff met with Steven P. Long, M.D. for a pain management appointment. (R. at 591-93.) Plaintiff reported that his pain was 3-4/10. (R. at 591.) On June 11, 2007, Plaintiff was distressed, because Plaintiff did not feel that Dr. Long believed Plaintiff's history. (R. at 585.) Dr. Long did not believe that more blocks would help, and he stated that Plaintiff could continue working under the restrictions that Dr. Simpson had given. (R. at 585.) Plaintiff stated that Lyrica helped with the tingling in his legs. (R. at 585.) Dr. Long noted that Plaintiff showed certain pain behaviors such as calling attention to himself, grimacing and seeing multiple physicians in succession. (R. at 586.)

On August 1, 2007, Plaintiff went to Dr. Simpson's office for a follow up for his radicular leg and back pain. (R. at 611.) Dr. Simpson's physician assistant encouraged Plaintiff to increase exercise and to get out of the house. (R. at 611.) That same day, Plaintiff rated his pain at 7/10 at his pain management appointment. (R. at 581.) Plaintiff reported that Darvocet, a pain reliever, helped his pain, and he received a prescription for Darvocet. (R. at 581-82.)

On October 1, 2007, Plaintiff saw Dr. Simpson for bilateral pain in his hips and legs, back pain, numbness and tingling. (R. at 606.) Dr. Simpson noted that Benjamin G. Seeman, D.O., his colleague, did not believe that Plaintiff was a reasonable candidate for additional treatment from Dr. Seeman. (R. at 606.) Upon examination, Dr. Simpson found no evidence of neurological abnormalities in terms of reflexes. (R. at 606.) Plaintiff had cogwheel[3] giving way in all of his major muscle groups when tested for strength. (R. at 606.) Dr. Simpson noted that Plaintiff had pain even to light palpitation across the lower back, and Plaintiff had pain with simulated spinal rotation. (R. at 606.) Dr. Simpson opined that Plaintiff had an antalgic gait and appeared to drag his left foot compared to his right foot when Plaintiff was last seen by Dr.

---

[3]   Cogwheel rigidity is clinically characterized by "muscular stiffness throughout the range of passive movement in both extension and flexion." Paolo Ghiglione et al., *Cogwheel Rigidity*, 62 Archives of Neurology, 828, 828 (2005).

Seeman. (R. at 606.) Dr. Simpson believed that he could not offer further assistance to Plaintiff, because Plaintiff had reached maximum medical improvement. (R. at 606.) Dr. Simpson believed that Plaintiff had some psychological overlay with Plaintiff's symptom complex. (R. at 606.)

On November 7, 2007, Paul T. Eckert, P.T. performed a functional capacity evaluation in connection with Plaintiff's workers' compensation case. (R. at 594-601.) Plaintiff reported that he could drive for forty-five minutes at a time, that he could sit for thirty minutes at a time, that he could stand for fifteen minutes at a time and that he could walk for ten minutes at a time. (R. at 594.) Plaintiff showed that he had the capability to perform lifting consistent with sedentary work. (R. at 595.) Plaintiff had full muscle movement. (R. at 597.) He was positive for one of the eight Waddell's signs. (R. at 598.)

On December 20, 2007, Dr. Simpson noted that Plaintiff was still capable of performing light, sedentary work. (R. at 603.) Additionally, Dr. Simpson did not think that Plaintiff's pain management was medically necessary. (R. at 603.)

In January 2008, Peter N. Ault, M.D. saw Plaintiff for lower back pain. (R. at 706-07.) Dr. Ault noted upon examination that Plaintiff was not in acute distress, that Plaintiff's cervical and thoracic back were normal and that Plaintiff had pain in his lumbar back with limited activity. (R. at 707.) Plaintiff had normal range of motion, stability and strength in his upper extremities. (R. at 707.) Dr. Ault noted that Plaintiff's hips were normal and that Plaintiff's lower extremities did not have edema. (R. at 707.)

On January 30, 2008, Dr. Bruce E. Mathern, M.D. saw Plaintiff for a neurosurgery visit, and Dr. Mathern explained that Plaintiff's MRIs did not show evidence of hardware loosening and only minor, degenerative changes at L5-S1 without evidence of disc herniation or significant

nerve root compression.  (R. at 642-43.)  Dr. Mathern further explained that the imaging studies did not support more surgical intervention of his spine.  (R. at 643.)

Dr. Ault referred Plaintiff to Charles H. Bonner, M.D. for further pain management.  (R. at 701-02.)  Dr. Bonner doubled Plaintiff's Ultram prescription as well as additional medication for breakthrough pain.  (R. at 701.)  Dr. Bonner determined that Plaintiff had permanent restrictions and had reached his maximum medical improvement in March 2008.  (R. at 695.)

Plaintiff complained to Dr. Ault in April 2008 that Plaintiff had chronic back pain, but Plaintiff's hip examination was normal.  (R. at 787-88.)  Plaintiff's lower extremities did not have edema, and Plaintiff had normal sensation and motor, normal reflexes and negative Babinski signs bilaterally.  (R. at 788.)  Plaintiff's gait was normal.  (R. at 788.)

On May 12, 2008, Plaintiff had an appointment with Dr. Bonner, and Plaintiff had no new complaints.  (R. at 954.)  Though Plaintiff requested an increase in medication, Dr. Bonner did not want to do so at that time.  (R. at 954.)  On June 20, 2008, Plaintiff again had no new complaints.  (R. at 949.)  Plaintiff's EMG study showed evidence that Plaintiff had chronic nerve root irritation in the lumbar area.  (R. at 949.)

On August 4, 2008, Plaintiff reported to Dr. Bonner that Plaintiff had some increased pain in his lower back and lower extremity as well as increased tingling in the calf.  (R. at 941.)  Additionally, Plaintiff stated that he had been rejected for DIB.  (R. at 941.)  Dr. Bonner's impression was that Plaintiff had been disabled for more than a year.  (R. at 941.)  On September 2, 2008, Plaintiff complained of back pain, but the medications did help reduce the pain.  (R. at 939.)  On October 6, 2008, Plaintiff again had no new complaints.  (R. at 946.)  Additionally, Plaintiff was awaiting vocational rehabilitation.  (R. at 946.)  In November 2008, Plaintiff complained of an exacerbation of pain.  (R. at 944.)  In December 2008, he also complained of

tingling in his legs. (R. at 936.) On February 4, 2009, Plaintiff stated that his medications were doing well. (R. at 930.) Plaintiff's range of motion and reflexes were both good, but Plaintiff had some tenderness to palpation. (R. at 930.) Dr. Bonner opined that the medications seemed to be working. (R. at 930.) On March 13, 2009, Plaintiff's former employer, in connection with Plaintiff's workers' compensation claim, denied additional treatment by Dr. Bonner. (R. at 928.)

On May 11, 2009, Plaintiff saw Dr. Ault and complained of moderate back pain. (R. at 782-83.) Plaintiff was using a cane to ambulate, and he described radiation down both legs. (R. at 782.) Upon examination, Plaintiff's hips were normal, and he had normal sensation and motor, normal reflexes and negative Babinski's signs. (R. at 783.) Plaintiff had lumbar back pain and walked with an abnormal gait. (R. at 783.)

On September 16, 2009, Plaintiff again saw Dr. Bonner. (R. at 927.) Plaintiff stated that he had pain of 6/10 radiating down to the lower extremities bilaterally. (R. at 924, 927.) Plaintiff ambulated with a cane. (R. at 927.) Plaintiff had a normal range of motion in both of his upper and lower extremities, but his lower spine range of motion was decreased. (R. at 927.)

In January and February of 2010, Plaintiff continued to complain of pain, and his EMG showed fibrosis of the paraspinal muscles, but there was no evidence of acute neuropathic changes in his extremities. (R. at 902, 916, 920.)

2. Mental Medical History.

Plaintiff was not receiving any formal mental health treatment when he saw Dr. Spector in November 2006. (R. at 530.) On the mental status exam, Dr. Spector noted that Plaintiff was a bit angry and sad, and that Plaintiff had no hallucinations. (R. at 531.) Plaintiff had some paranoid ideation, but Plaintiff's cognitive faculties and associations were intact. (R. at 531.) Dr.

Spector diagnosed Plaintiff with depression, adjustment disorder and status post-work related injury. (R. at 532.)

On January 12, 2007, Theresa Simon, M.D. reported that Plaintiff was feeling sad and depressed during Dr. Simon's initial psychiatric evaluation treatment plan. (R. at 687.) Plaintiff's speech was normal, and Plaintiff had neither suicidal ideation nor delusions, though Plaintiff's affect was anxious. (R. at 691-92.) Plaintiff was alert and oriented. (R. at 692.) Further, Plaintiff's cognitive function, memory, attention/concentration and capacity for abstract thinking were grossly intact. (R. at 692.) Dr. Simon's impression was depression secondary to Plaintiff's general medical condition. (R. at 693.) Dr. Simon told Plaintiff to follow up with an individual therapist as well as a pain management physician. (R. at 685.)

On February 5, 2007, Plaintiff had a GAF score of 60.[4] (R. at 683.)

On March 23, 2007, Plaintiff stated to his licensed professional counselor that Dr. Simpson had given Plaintiff a poor prognosis for his disability claim. (R. at 675.) On April 6, 2007, Plaintiff's counselor noted that Plaintiff was improved and that Plaintiff had good insight. (R. at 673.) On May 4, 2007, Plaintiff's counselor again noted improvement. (R. at 670.) On May 24, 2007, Plaintiff stated that Plaintiff's doctor was inappropriate, because Plaintiff's doctor implied that Plaintiff was lying about his condition. (R. at 667.) On May 31, 2007, the counselor reported improvement. (R. at 666.)

---

[4]   GAF of 60 falls within a range of "moderate symptoms," characterized by "flat affect and circumstantial speech or occasional panic attacks" or "moderate difficulty in social, occupational, or school functioning," characterized by having "few friends" or experiencing "conflicts with peers or co-workers." DSM-IV-TR 34 (American Psychiatric Association 2000). Notably, the latest version of the DSM has dropped the use of GAF scores, finding that their use has been criticized due to a "lack of conceptual clarity," and "questionable psychometrics in routine practice." DSM-5 16 (American Psychiatric Association 2013).

On June 19, 2007, Plaintiff saw Dr. Simon who reported that Plaintiff was still having panic attacks and anxiety, but was doing better with his depression. (R. at 664.) Plaintiff's depression and anxiety were treated with medication during the fall of 2007. (R. at 658-61.)

Plaintiff began seeing George White, Pys. D. for counseling in August of 2007. (R. at 725-31, 809-92.) On February 5, 2008, Dr. White noted that Plaintiff showed a small improvement in mobility, motivation and attitude. (R. at 880.) On April 1, 2008, Plaintiff again had an improved mood and attitude. (R. at 875.)

On February 8, 2008, Plaintiff saw James B. Wade, Ph. D. in connection with Plaintiff's workers' compensation case. (R. at 756-66.) Dr. Wade stated that he did not think that Plaintiff could return to work. (R. at 766.)

On April 18, 2008, Albert H. Jones, M.D. saw Plaintiff and recommended against a spinal cord stimulator trial because of Plaintiff's depression and chronic pain behavior with nocebo responses. (R. at 772.) Dr. Jones noted that Plaintiff having no pain was unlikely, but Plaintiff did show some maladaptive chronic pain behavior, and Dr. Jones believed that there were some pyscho-social stress depression related issues of functional overlay. (R. at 772.) Dr. Jones's impression was that Plaintiff's depression, anxiety and chronic pain syndrome probably prohibited Plaintiff from successful, competitive employment despite functional capacity for sedentary work and that Dr. Simon was in the best position to make that determination. (R. at 773.)

On June 18, 2008, Dr. White noted that Plaintiff was angry, because Plaintiff believed that he was not being taken seriously about the level of pain that he had. (R. at 870.) On August 28, 2008, and September 3, 2008, Plaintiff's mood was improved, and Plaintiff was doing

somewhat better.  (R. at 861-62.)  On September 24, 2008, Plaintiff again stated that he was not

being believed in the level of pain that he had.  (R. at 859.)

        In an undated "To Whom It May Concern" letter, Dr. Simon stated that Plaintiff would

not be able to work more than twelve hours each week (related to workers' compensation) and

that Plaintiff would not be able to drive to and from Richmond (related to Plaintiff's disability).

(R. at 663.)  On June 27, 2008, Dr. Simon checked boxes to indicate that Plaintiff's affective

disorder met listing 12.04, and in support of her opinion, Dr. Simon stated "see progress notes."

(R. at 732-35.)

        On August 1, 2008, Dr. Simon noted that Plaintiff continued to feel overwhelmed and

anxious, and Plaintiff complained of conflicts with his wife.  (R. at 808.)  On December 12,

2008, Plaintiff was doing better and working on the relationship with his wife.  (R. at 806.)  On

February 13, 2009, and April 10, 2009, Dr. Simon continued Plaintiff's medications.  (R. at 804-

05.)

        On June 12, 2009, Plaintiff reported being happy, because his workers' compensation

mediation had resulted in a settlement.  (R. at 803.)  On July 7, 2009, Plaintiff reported that he

had gone on vacation with his family.  (R. at 823.)

        On July 21, 2009, August 11, 2009, and September 1, 2009, Plaintiff continued to present

overall improvement to Dr. White.  (R. at 820-22.)  On August 14, 2009, and October 9, 2009,

Plaintiff had appointments with Dr. Simon, and Plaintiff's affect was euthymic.  (R. at 801-02.)

On October 22, 2009, Plaintiff's mood was positive.  (R. at 818.)  On November 12, 2009,

Plaintiff was in a much better mood.  (R. at 816.)

        On February 26, 2010, Dr. Simon noted that Plaintiff reported that Plaintiff was doing

better and that Plaintiff's affect was euthymic.  (R. at 799.)  On July 2, 2010, Plaintiff reported

that he was doing well with his wife and that his son was playing baseball. (R. at 796.) On September 10, 2010, Plaintiff had a euthymic affect and indicated that he had been doing fairly well. (R. at 795.)

On December 3, 2010, Dr. White completed a mental RFC assessment. (R. at 893-95.) Dr. White opined that Plaintiff's ability to remember, understand and carry out short and simple instructions, to interact with the general public and coworkers, to maintain socially appropriate behavior, to make simple work-related decisions, and to set realistic goals were only moderately impaired. (R. at 893-94.) Plaintiff's ability to remember locations and work-like procedures, carry out detailed instructions, sustain an ordinary routine without special supervision, work in coordination with others, ask simple instructions, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to expected and unexpected changes in the work setting, and be aware of normal hazards were only impaired to a "moderately severe" extent. (R. at 892-94.) Plaintiff's ability to maintain attention and concentration for at least two straight hours, his ability to complete a normal workday and workweek, and use public transportation were severely impaired. (R. at 893-94.)

3. State Agency Physicians' Opinions.

On March 14, 2007, Alan Entin, Ph. D., a state agency psychologist, completed a psychiatric review technique and mental RFC assessment. (R. at 552-68.) Dr. Entin opined that Plaintiff had mild restriction of activities of daily living and mild difficulties in maintaining social functioning. (R. at 566.) Dr. Entin further opined that Plaintiff was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from Plaintiff's depression. (R. at 554.) On June 26, 2007, Leslie E. Montgomery, Ph.D. affirmed the assessment of Dr. Entin as written. (R. at 571.)

On June 27, 2007, Tony Constant, M.D., a state agency physician, opined that Plaintiff could perform light work with occasional climbing, stooping and crouching, and frequent balancing, kneeling and crawling. (R. at 574, 580.)

### 4.  Plaintiff's Testimony.

At the first administrative hearing, Plaintiff admitted that his back surgery on March 6, 2006, helped relieve some of his pain. (R. at 90.) Plaintiff believed that he could lift ten pounds. (R. at 92.) Plaintiff could stand for about fifteen minutes at a time and then he would need to sit down for about ten to fifteen minutes. (R. at 92.) He could walk about 200 feet without a cane before needing to sit down. (R. at 39, 92.) Plaintiff drove his car once or twice per week. (R. at 86.) Plaintiff admitted that his psychotropic medications helped some. (R. at 97.) Plaintiff occasionally went out to eat and to his son's baseball games. (R. at 38, 99.)

### 5.  Plaintiff's Reported ADLs.

Plaintiff completed an adult function report on February 9, 2007. (R. at 277-84.) Plaintiff reported that most days he just sat or laid around the house. (R. at 277.) Plaintiff stated that he would occasionally go out and look for a job. (R. at 277.) He stated that he watched his 4-year-old son twice a week. (R. at 278.) Additionally, he took and dropped off his son from preschool. (R. at 284.) Plaintiff stated that he did not need reminders to take care of his personal needs and grooming. (R. at 279.) Plaintiff could generally take care of himself, limited by some pain in bending over. (R. at 278.)  He helped fold laundry several times each month. (R. at 279.)

Plaintiff stated that he went outside three to four times each week for doctor's appointments or job searches. (R. at 280.) He would go out alone. (R. at 280.) Additionally, he would drive a car. (R. at 280.) He would shop in stores and go to the pharmacy. (R. at 280.)

Each of these trips would take thirty to forty-five minutes. (R. at 280.) He could count change, handle a savings account and use a checkbook or money order. (R. at 280.) Plaintiff could not pay the bills, because he had panic attacks. (R. at 280.) Plaintiff stated that he could not take the stress and pressure of taking care of handling money. (R. at 281.)

Plaintiff stated that he reads the Bible and watches football weekly. (R. at 281.) He spends time with others. (R. at 281.) Plaintiff stated that he would see his best friend a few times each month. (R. at 281.) Additionally, he would play cards and go out to dinner. (R. at 281.) Plaintiff regularly went on job searches. (R. at 281.) Additionally, he went to doctor's appointments regularly. (R. at 281.) Plaintiff stated that he needed to be reminded to go places, but Plaintiff did not need someone to accompany him. (R. at 281.)

Plaintiff stated that his condition affected lifting, squatting, bending, standing, walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, concentration, understanding, following instructions and getting along with others. (R. at 282.) Plaintiff stated that he was limited to lifting twenty five pounds. (R. at 282.) Plaintiff stated that he could walk for a quarter of a mile before needing to stop and rest for five to ten minutes. (R. at 282.) He further stated that he could concentrate for fifteen to twenty minutes before having to move around. (R. at 282.) He stated that he could finish what he started, such as a conversation, chores, reading or watching a movie. (R. at 282.) He was "ok" at following written instructions such as a recipe. (R. at 282.) He had trouble following spoken instructions. (R. at 282.)

Plaintiff stated that he did not have trouble with authority figures and that he tried to be nice to everyone. (R. at 283.) Further, he had never been laid off or fired for problems getting along with others. (R. at 283.) He handled neither stress nor changes in routine well. (R. at 283.)

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB on January 5, 2007, claiming disability due to the residual effects of a back injury. (R. at 10.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[5] (R. at 10-11.) On July 25, 2008, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 10.) The Appeals Council vacated the ALJ's decision and remanded for further review. (R. at 10.) On December 6, 2010, Plaintiff testified at the second hearing. (R. at 10.) On January 20, 2011, the ALJ issued a decision find that Plaintiff was not disabled, as defined by the Act. (R. at 10-25.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on September 12, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (R. at 1–6.)

## III. QUESTIONS PRESENTED

1. Did substantial evidence in the record support the ALJ's determination that Plaintiff did not meet the listings in §§ 12.04 and 12.06?

2. Does substantial evidence in the record exist to support the ALJ's determination that Plaintiff retains the physical and mental residual function capacity to perform limited sedentary work?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence in the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

---

[5]    Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the

kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.

*Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S.

389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the

record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th

Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner

based on the record as a whole, the Court must "take into account whatever in the record fairly

detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks

omitted)). The Commissioner's findings as to any fact, if the findings are supported by

substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation

omitted). While the standard is high, if the ALJ's determination is not supported by substantial

evidence on the record or if the ALJ has made an error of law, the district court must reverse the

decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177.

The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court

must examine on appeal to determine whether the correct legal standards were applied and

whether the resulting decision of the Commissioner is supported by substantial evidence on the

record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[6] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment, and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[7] based on an assessment of

---

[6]   SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[7]   Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

the claimant's RFC[8] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

[8]     RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

## V. ANALYSIS

A.     The ALJ's Opinion.

The ALJ found at step one that Plaintiff had not engaged in SGA since the alleged onset

of his disability.  (R. at 13.)  At steps two and three, the ALJ found that Plaintiff had the severe

impairments of lumbar radiculopathy with chronic low back pain secondary to an L4-5 fusion,

obesity, a major depressive disorder secondary to a general medical condition (and a possible

somatoform pain disorder), and anxiety with panic attacks, but that these impairments did not

meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, as required for the award

of benefits at that stage.  (R. at 13-14.)  The ALJ next determined that Plaintiff had the RFC to

perform sedentary work except that due to his physical impairments, pain and obesity, he must

be able to change positions as needed throughout the work day and that nonexertionally, due to

his psychiatric impairments, he can understand, remember and carry out simple instructions

found in unskilled work, and can perform tasks entailing occasional contact with the general

public.  (R. at 16.)

The ALJ then determined at step four of the analysis that Plaintiff could not perform his

past relevant work as a chemical operator, assistant crew leader for a power house, and an

operator and support technician for a cigarette factory because of the levels of exertion required

in each position.  (R. at 23-24.)  At step five, after considering Plaintiff's age, education, work

experience and RFC, and after consulting a VE, the ALJ found that there are other occupations

that exist in significant numbers in the national economy that Plaintiff could perform.  (R. at 24-

25.)  Specifically, the ALJ found that Plaintiff, regardless of his limitations, could work as an

addressor, a call out operator and a final assembler.  (R. at 24.)  Accordingly, the ALJ concluded

that Plaintiff was not disabled and was employable such that he was not entitled to benefits. (R. at 25.)

Plaintiff moves for a finding that he is entitled to benefits as a matter of law, or in the alternative, he seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem. at 30.) In support of his position, Plaintiff argues that: (1) the ALJ's determination that Plaintiff's mental conditions did not meet the requirements of §§ 12.04 and 12.06 is not supported by substantial evidence; and, (2) the ALJ's determination that Plaintiff retained the physical and emotional RFC is not supported by substantial evidence. (Pl.'s Mem. at 16-29.) Defendant argues in opposition that the Commissioner's final decision is supported by substantial evidence and application of the correct legal standard such that it should be affirmed. (Def.'s Mot. for Summ. J. and Mem. in Supp. "Def.'s Mem." (ECF No. 10) at 1-2.)

B.   Substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria for the listings in §§ 12.04 and 12.06.

Plaintiff argues that substantial evidence does not support the ALJ's determination that Plaintiff's mental conditions did not meet the requirements of §§ 12.04 and 12.06. (Pl.'s Mem. at 16-22.) Defendant responds that the ALJ's conclusion is supported by substantial evidence. (Def.'s Mem. 16-20.) The Court finds that substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria for the listings in §§ 12.04 and 12.06.

Plaintiff has the burden of proving that he meets or equals a listing. *Yuckert,* 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530.

Plaintiff challenges the ALJ's determination that he did not meet or equal the listing in

§ 12.04, which reads:

> Affective disorders:   Characterized by a disturbance of mood, accompanied by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically or documented persistence, either continuous or intermittent, of one of the following:
>
>   1. Depressive syndrome characterized by at least four of the following:
>
>     a. Anhedonia or pervasive loss of interest in almost all activities; or
>     b. Appetite disturbance with change in weight; or
>     c. Sleep disturbance; or
>     d. Psychomotor agitation or retardation; or
>     e. Decreased energy; or
>     f. Feeling of guilt or worthlessness; or
>     g. Difficulty concentrating or thinking; or
>     h. Thoughts of suicide; or
>     i. Hallucinations, delusions, or paranoid thinking . . .

. . . and

> B. Resulting in at least two of the following:
>
>   1. Marked restriction of activities of daily living; or
>   2. Marked difficulties in maintaining social functioning; or
>   3. Marked difficulties in maintaining concentration, persistence, or pace; or
>   4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt.404, subpt P, app. 1, § 12.04.

Additionally, Plaintiff challenges the ALJ's determination that he did not meet or equal

the listing in § 12.06, which reads:

Anxiety-related disorders:   In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented findings of at least one of the following:

    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

        a. Motor tension; or
        b. Autonomic hyperactivity; or
        c. Apprehensive expectation; or
        d. Vigilance and scanning; or

    2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
    3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
    4. Recurrent obsessions or compulsions which are a source of marked distress; or
    5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

and

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt.404, subpt P, app. 1, § 12.06.

The degree of impairment for each category is measured on a five-point scale using the

designations: "None, Mild, Moderate, Marked and Extreme." 20 C.F.R. § 404.1520a(c)(4).  A

marked impairment is defined loosely as "more than moderate but less than extreme" and "arises when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt 404, subpt P, app. 1, § 12.00 (c).

Repeated periods of decompensation is measured on a four-point scale using the designation "[n]one, one or two, three and four or more." 20 C.F.R. § 404.1520a(c)(4). Repeated periods of decompensation, each for extended durations, requires "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. pt 404, subpt P, app. 1, § 12.00(c)(4). "If [Plaintiff] experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the ALJ] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id.*

Here, the ALJ determined that Plaintiff exhibited signs and symptoms of major depressive disorder, thus meeting the § 12.04(A) requirement. (R. at 14.) The ALJ determined, however, that Plaintiff did not fully meet the criteria under § 12.04(B). (R. at 14-15.) The ALJ also determined that Plaintiff exhibited signs and symptoms of anxiety with panic attacks, thus meeting the § 12.06(A) requirement. (R. at 14.) The ALJ determined, however, that Plaintiff did not fully meet the criteria under § 12.06(B). (R. at 14-15.) Plaintiff had mild restrictions through his date of last insured, moderate difficulties in social functioning, moderate difficulties with concentration, persistence or pace, and no episodes of decompensation. (R. at 15.) Further, Plaintiff failed to meet both the § 12.04(C) and § 12.06(C) criteria. (R. at 15.) Substantial evidence supports these findings.

As to Plaintiff's ADLs, he was generally able to take care of his personal needs, though pain made some functions more difficult. (R. at 279.) Plaintiff was able to make sandwiches for himself. (R. at 279.) Additionally, he was able to assist his wife by folding laundry. (R. at 279.) Plaintiff was able to go out on his own, drive a car and shop in stores. (R. 280.) He could take and pick up his son from preschool as well. (R. at 284.)

As to Plaintiff's social functioning, Plaintiff was able to pick up and watch his son after preschool. (R. at 284.) Plaintiff was able to drive on his own and shop in stores. (R. at 280.) Additionally, Plaintiff was able to go out and look for a job. (R. at 277.) Plaintiff also occasionally went out to eat and to his son's baseball games. (R. at 38, 99.) Plaintiff was able to see his friends, and he was also able to play cards. (R. at 281.) Substantial evidence supports the ALJ's finding that Plaintiff's limitations in social functioning were moderate, rather than marked.

As to Plaintiff's concentration, persistence or pace, Plaintiff reported that he was able to go on job searches. (R. at 277.) Plaintiff could drive himself as well as shop in stores. (R. at 280.) Plaintiff reported that he could finish what he started, such as watching a movie or reading. (R. at 282.) Further, he could follow written instructions. (R. at 282.) Plaintiff had no reported episodes of decompensation. (R. at 15.) Therefore, substantial evidence supports the ALJ's determination that Plaintiff's limitations in concentration, persistence or pace were moderate, rather than marked and that Plaintiff did not meet the requirements of §§ 12.04 and 12.06.

C. Substantial evidence in the record exists to support the ALJ's determination that Plaintiff retains the physical and mental residual function capacity to perform limited sedentary work.

Plaintiff argues that the ALJ's determination that Plaintiff retained the physical and emotional RFC is not supported by substantial evidence. (Pl.'s Mem. at 22-29.) Defendant responds that the ALJ's determination is supported by substantial evidence. (Def.'s Mem. at 20-26.) The Court concludes that substantial evidence supports the ALJ's determination that Plaintiff retains the physical and mental residual function capacity to perform limited sedentary work.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ will first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). Generally, it is the responsibility of the claimant to provide the evidence that the ALJ utilizes in making his RFC determination; however, before a determination is made that a claimant is not disabled, the ALJ is responsible for developing the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the residual function capacity to perform sedentary work, except that:

> due to his physical impairments, pain and obesity, he must be able to change positions as needed throughout the workday. Nonexertionally, due to his psychiatric impairments, he can understand, remember and carry out simple

instructions found in unskilled work, and can perform tasks entailing occasional contact with the general public.

(R. at 16.) "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. 404.1567(a).  A sedentary job "involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* "Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

In coming to the determination that Plaintiff could perform sedentary work with some limitations, the ALJ relied on Plaintiff's medical history as well as Plaintiff's own testimony and reports. (R. at 16-23.) Substantial evidence supports the ALJ's determination.

Plaintiff reported to Dr. Simpson in 2006 that Plaintiff was walking two to three miles each day. (R. at 621.) Later that year, Plaintiff told Dr. Simpson that Plaintiff was regularly exercising. (R. at 617.) In February 2007, Dr. Simpson issued modified permanent restrictions to Plaintiff that limited Plaintiff to lifting no more than twenty-five pounds, no bending and that Plaintiff must alternate between sitting and standing as needed. (R. at 616.) On December 20, 2007, Dr. Simpson opined that Plaintiff was still capable of performing light, sedentary work. (R. at 603.) The ALJ gave great weight to this opinion, because Dr. Simpson was Plaintiff's treating orthopedist. (R. at 23.)

Paul Eckert, a physical therapist, similarly noted that Plaintiff could perform the lifting necessary for sedentary work. (R. at 595.) Dr. Jones also noted that Plaintiff had the possible functional capacity for sedentary work. (R. at 773.) Additionally, Dr. Entin, a state agency physician, opined that Plaintiff was able to meet the mental demands of competitive work on a sustained basis. (R. at 554.) Dr. Montgomery affirmed Dr. Entin's assessment. (R. at 571.) Dr.

Constant, another state agency physician, opined that Plaintiff could engage in light work. (R. at 572-78, 580.)

Plaintiff's own statements further support the ALJ's determination. Plaintiff testified that he could stand for about fifteen minutes at a time before needing to sit down and that he could walk about a quarter of a mile without a cane before needing to rest. (R. at 92, 282.) He could lift about ten pounds. (R. at 92.) Plaintiff reported that he would go out alone and could shop or go to the pharmacy. (R. at 280.) Further, Plaintiff reported that he could go on job searches. (R. at 280.) Plaintiff spent time with others and had never been laid off or fired for failing to get along with others. (R. at 281, 283.) Though Plaintiff had trouble following spoken instructions, he could follow written instructions. (R. at 282.) Additionally, Plaintiff could finish what he started, such as a chores or reading. (R. at 282.) In Plaintiff's activities of daily living, Plaintiff reported that he cared for his son and drove him to and from day care. (R. at 277-78.)

Therefore, substantial evidence in the record supports the ALJ's determination that Plaintiff could perform sedentary work with restrictions.

## VI.  CONCLUSION

For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney and to and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within**

27

fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

                                                     /s/

                                      David J. Novak
                                      United States Magistrate Judge

Richmond, Virginia
Dated: September 9, 2013